IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GE LIGHTING SOLUTIONS, LLC, | ) | CASE NO. 1:12-cv-00354-JG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGE JAMES S. GWIN** |
| | ) | |
| AGILIGHT, INC., | ) | **MAGISTRATE JUDGE MCHARGH** |
| Defendant. | ) | |
| | ) | |

---

**AGILIGHT, INC.'S MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM**

---

Jonathan D. Pauerstein
ROSENTHAL PAUERSTEIN
SANDOLOSKI AGATHER LLP
755 East Mulberry, Suite 200
San Antonio, Texas, 78212
Telephone: 210.244.8830
Facsimile:  210.244.8930
jpauerstein@rpsalaw.com

Harry D. Cornett, Jr. (0013179)
Benjamin C. Sassé (0072856)
TUCKER ELLIS LLP
925 Euclid Ave., Suite 1150
Cleveland, OH 44115-1414
Telephone:    216.592.5000
Facsimile:    216.592.5009
harry.cornett@tuckerellis.com
benjamin.sasse@tuckerellis.com

Attorneys for Defendant AgiLight, Inc.

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT  ……………………………...…………….....1

II.  GOVERNING LEGAL PRINCIPLES ………………………………..……..1

III.  U.S. PATENT NO. 7,633,055……………………………………………….3

    A.  The '055 Method Claim………………………………………………..3

    B.  AgiLight's Manufacturing Method..………………………………….5

    C.  The Missing Elements………………………………………………..7

IV.  U.S. PATENT NO. 7,832,896………………………………………….......9

    A.  Prosecution History Estoppel Limits Claim 16………………….…......10

    B.  The AgiLight Lens Does Not Have A
            Generally Spherical Outer Profile.………………………………...…….12

    C.  AgiLight's Lens Does Not Have A
            Substantially Ellipsoidal Inner Profile……………………………….…15

V.  CONCLUSION……………………………………………….……….......18

## TABLE OF AUTHORITIES

*Anchor Wall Sys. v. Rockwood Retaining Walls,*
340 F.3d 1298 (Fed. Cir. 2003)……………………………………………………14

*ATD Corp. v. Lydall, Inc.,*
159 F.3d 534 (Fed. Cir. 1998)………………………………………………...3

*Bai v. L & L Wings,*
160 F.3d 1350 (Fed. Cir. 1998)……………………………………………....3

*Baxa Corp. v. McGaw Inc.,*
981 F. Supp. 1348 (D. Colo. 1997), *aff'd,* 185 F.3d 883 (Fed.Cir. 1999)…………12

*Conoco, Inc. v. Energy & Environmental Intern.,*
460 F.3d 1349 (Fed. Cir. 2006)…………………………………………………11

*Exigent Tech. v. Atrana Solutions, Inc.,*
442 F.3d 1301 (Fed. Cir. 2006)……………………………………...……3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
535 U.S. 722 (2002)…………………………………………………………10, 11

*Haynes Intern., Inc. v. Jessop Steel Co.,*
8 F.3d 1573 (Fed. Cir. 1993)……………………………………………12

*Hutchins v. Zoll Med. Corp.,*
492 F.3d 1377 (Fed. Cir. 2007)……………………………………………....2

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,*
420 F.3d 1369 (Fed. Cir. 2005)……………………………………….…...3

*Rheox, Inc. v. Entact, Inc.,*
276 F.3d 1319 (Fed. Cir. 2002)……………………………………………....12

*Vivid Techs., Inc. v. American Science & Eng'g, Inc.,*
200 F.3d 795 (Fed. Cir. 1999)…………………………………….…………3

*Voice Techs. Group, Inc. v. VMC Sys., Inc.,*
164 F.3d 605 (Fed. Cir. 1999)……………………………………………....3

*Wahpeton Canvas Co. v. Frontier, Inc.,*
870 F.2d 1546 (Fed. Cir. 1989)…………………………………………......4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GE LIGHTING SOLUTIONS, LLC, | ) | CASE NO. 1:12-cv-00354-JG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JAMES S. GWIN |
| | ) | MAGISTRATE JUDGE McHARGH |
| AGILIGHT, INC., | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## AGILIGHT'S MOTION FOR SUMMARY JUDGMENT
## AND SUPPORTING MEMORANDUM

As its Motion For Summary Judgment And Supporting Memorandum, AgiLight states the following:

### I.
### PRELIMINARY STATEMENT

AgiLight's products do not infringe the asserted claims of the '055 and '896 Patents, as construed by this Court. This is apparent from an analysis of the asserted patent claims and the allegedly infringing products. GE has no evidence to establish otherwise, so there is no genuine issue of material fact to be decided by a jury. AgiLight accordingly should be granted summary judgment denying GE's claims under these two patents.

### II.
### GOVERNING LEGAL PRINCIPLES

To establish patent infringement, the patentee must prove that every element and limitation of at least one patent claim is present in the accused product or method, either literally or, if allegedly embodied by an equivalent, in compliance with the rules of equivalency.

*Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007).[1]  Conversely, if a patentee cannot prove one or more elements or limitations of the asserted claims, the patentee cannot establish infringement.

As GE has argued in the past, "[b]ecause the determination of the scope of an asserted patent claim is an issue of law, and because the structure and operation of the devices accused of infringement are seldom in dispute, summary judgment is particularly appropriate in patent infringement cases."  GE Lighting Solutions, LLC's Motion For Summary Judgment Of Non-Infringement And Supporting Brief, *Lektron, Inc. v. GE Lighting Solutions, LLC, et al.*, at p. 8.[2]  GE there emphasized the fact that Chief Judge Rader of the Federal Circuit "has strongly encouraged the bar and the bench to resolve issues in patent infringement actions using the summary judgment process . . . ."  *Id.* at p. 9.  Judge Rader, in a statement quoted by GE, wrote the following:

> In these vast technical [patent infringement] cases, summary judgment is the key to efficient resolution of disputes. The bar has a responsibility to work with the bench to present, if at all possible, a summary judgment motion, or maybe TWO, that can end the litigation or narrow the case to dimensions more amenable to settlement.

Chief Judge Randall R. Rader, *The State of Patent Litigation*, Eastern District of Texas Judicial Conference (September 27, 2011), at page 6.[3]

In the case at hand, the Court has construed the disputed claim terms.  Summary judgment often flows from the trial court's claim construction decision.  "Upon construction of the claims, summary judgment may follow when it is shown that the infringement issue can be

---

[1]    GE did not raise the doctrine of equivalents in its infringement contentions.  The deadline for amending those contentions has passed, and GE cannot now invoke the doctrine of equivalents.  *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761 (Fed. Cir. 2002).

[2]    Case No. 11 CV 413TCK TLW, in the United States District Court for the Northern District of Oklahoma. A true and correct copy of the cited motion, without its lengthy exhibits, is included in AgiLight's Appendix In Support of Motion For Summary Judgment And Supporting Memorandum (the "Appendix"), at Tab 1.  The Appendix has been filed contemporaneously herewith.

[3]    *See* Appendix, Tab 2.

2

373250.1

reasonably decided only in favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant." *Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999); *see also ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 540 (Fed. Cir. 1998); *Bai v. L & L Wings*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

An accused infringer may establish its right to summary judgment by negating an element of the patentee's claim or by showing that the evidence on file does not raise a genuine issue of material fact, thereby shifting the burden to the patent-holder to present evidence to raise an issue as to each element of its claim. *Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 806-07 (Fed. Cir. 1999). GE has the burden of proving that AgiLight has infringed its patents. AgiLight therefore need only move for summary judgment and point out ways in which its accused products differ from the claim limitations. *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006) ("nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations."). Once AgiLight has done so, the burden of coming forward with evidence falls on GE. *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1373 (Fed. Cir. 2005). Because GE has no evidence to prove each element and limitation of the asserted claims, AgiLight should be granted summary judgment.

## III.
## U.S. PATENT NO. 7,633,055

A.      **The '055 Method Claim.**

GE alleges that AgiLight's method of manufacturing its SignRayz® G1, G2, and "Mini" products infringes Claims 1, 2, 3, 7, 8, 9, and 13 of the '055 Patent.[4]  The '055 Patent enables a method of manufacturing LED light engines.  That method requires a series of steps carried out using particular structures, including the "annular gasket" and the "generally hollow member." These structures are within the mold during the molding process and are necessary to practice the invention of the '055 patent because the steps in the disclosed method cannot be carried out without them.[5]  This is evident from Claim 1, which claims:

> 1.  A method comprising:
>
> disposing an optoelectronic device on a circuit board, the disposing including electrically connecting the optoelectronic device with the circuit board;
>
> **disposing an annular gasket on the circuit board to surround the optoelectronic device**; and
>
> sealing the circuit board with a sealant that also **covers at least an outer annular portion of the annular gasket**, but does not cover the optoelectronic device, **the sealing comprising** (i) disposing the circuit board in an injection mold that includes a **generally hollow member** receiving the optoelectronic device and **having an edge sealing against the gasket;** and (ii) injecting sealing material into the injection mold, **the injected sealant material being blocked by the generally hollow member and the annular gasket** from reaching the optoelectronic device.

---

[4]  Other than Claim 1, these claims are dependent claims and are not infringed if Claim 1 is not infringed. *See, e.g., Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

[5]  A copy of the '055 Patent is included in the Appendix at Tab 3.

'055 Patent, Claim 1 (emphasis supplied).[6] This method claim clearly requires a sequence of four basic steps and the use of particular structures—the "annular gasket" and the "generally hollow member"—to form an edge seal and isolate an LED in a void during molding.

The following figure illustrates the structure in the mold for the manufacturing method enabled in the '055 Patent.



The "annular gaskets" are identified by reference number 132, and the "generally hollow members" are designated 146. When the depicted mold is closed, the bottom edges of the generally hollow members bear down on the annular gaskets and form the edge seal, leaving the LED in a void inside the generally hollow member. These two structures thus are essential to carrying out the steps of the method claimed in the '055 Patent. Without them, the claimed method cannot be practiced.

## B. AgiLight's Manufacturing Method.

AgiLight's method of manufacturing its SignRayz® G1 and G2 products[7] does not embody all of the elements and limitations of Claim 16. In particular, the "annular gasket" and

---

[6]   The elements and limitations set forth in boldface above in the quotation of Claim 1 are not part of the structure and method used to manufacture AgiLight's products.

5

"generally hollow member" called for as part of the structure within the mold enabling the '055 Patent's method are absent.  AgiLight's method does not involve disposing an annular gasket on the PCB to surround the LED.  It also does not involve creating a seal between the edge of a generally hollow member and an annular gasket to block sealing material from the LED during molding.  Because these elements are missing, AgiLight should be granted a summary judgment of non-infringement as to the '055 Patent.

AgiLight's SignRayz® G2 products are manufactured using a mold and structures within it that enable the method depicted in the following drawing, which is a cross-sectional view through the center of a mold containing AgiLight's SignRayz® G2 product after injection of the molten material into the closed mold:



Affidavit of Glenn Freeman, paragraph 5.[8]  The yellow portions of the drawing labeled "Tool Top" and "Tool Bottom" are the separate, solid metal upper and lower parts of the mold.  *Id.* The red areas are the molding material.  *Id.*  The optic piece is shown in light blue, the printed

---

[7]     The allegedly infringing products are the SignRayz® Apex G1, Apex G2, Core G1, Core G2, Base G1, Base G2, Color G1, Color G2, and "Mini" products.  "G1" products do not use lenses to modify the beam pattern of the light by the LEDs, while the "G2" products have lenses that alter the beam patterns.

[8]     Mr. Freeman's affidavit can be found at Tab 4 of the Appendix.

circuit board ("PCB") is shown in green, the LED is colored brown, and the supporter for the PCB is gray.

In the method used to manufacture AgiLight's products, three open sockets in the bottom part of the mold (the "Tool Bottom") receive the optic, which consists of three lenses joined together in a single piece. Freeman Affidavit, paragraph 6.[9]  Each lens is slightly larger than the inner dimension of the socket into which it is placed, so the lenses fit tightly into the sockets and press against their sidewalls.  *Id.*  The lenses fill the sockets, which thus are not open during molding.  *Id.*

The PCB with the LEDs mounted on it then is placed over the lens piece, with the LEDs on its downward-facing side.  Freeman Affidavit, paragraph 7.  The lenses receive and cover the LEDs.  Each LED is completely covered by a lens during molding, not exposed or uncovered within a void or hollow space in the mold.  *Id.*

Next, a supporter is placed above the bottom of the PCB to hold it in place when the mold is filled.  Freeman Affidavit, paragraph 7.  The mold then is closed, and the molding material (shown in red) is injected from the side of the mold and flows into and fills the cavities formed within the mold.  *Id.*, paragraph 8.  The tight fit between the surface of each lens and the surface of the socket keeps the molding material from flowing into the sockets and covering the lenses.  *Id.*

## C.    The Missing Elements.

The drawing above demonstrates that the requisite "annular gasket" is not present in the structure enabling the molding method used to make AgiLight's SignRayz® products.  The Court has defined "annular gasket" to mean "a three-dimensional deformable material used to

---

[9]    In the drawing, the left-most lens appears separate from the others.  It is connected to them, but the connecting piece is inside the mold and thus is not seen in the drawing.  Freeman Affidavit, paragraph 6.

373250.1

make a pressure-tight joint between stationary parts, with an opening in its center capable of sealing off its center area when bonded statically between stationary parts on its top and bottom." Opinion and Order of December 13, 2012, at p. 8.  No open-centered annular gasket is disposed on the PCB to surround the LED in AgiLight's method.  Instead, AgiLight's lens receives the LED and completely covers it during molding.  There thus is no open-centered gasket bonded between stationary parts in the structure within the mold that enables the method used to manufacture the AgiLight products.

Nor is there a "generally hollow member."  The Court construed "generally hollow member" to denote "a tubular or prism-like element that is capable of attaching to a mold and is capable of acting with a gasket to isolate its contents (such as an LED) from sealants."  Opinion and Order of December 13, 2012, at p. 11.  There is no tubular or prism-like element capable of attaching to the mold in AgiLight's method.

AgiLight's method also lacks the essential step of a "generally hollow member receiving the optoelectronic device and having an edge sealing against the gasket . . . ."  There is no step in AgiLight's manufacturing method in which a seal is made between an annular gasket and the edge of a generally hollow member in order to keep the molding material away from the LED. Instead, AgiLight's LED is completely covered by the lens, which is kept free of molding material by the fit of the lens into the socket in the mold.  As a result, AgiLight's manufacturing method does not involve making a seal between the edge of a generally hollow member and an annular gasket, as required by the steps and related structures claimed in the '055 Patent.

All of the allegedly infringing products are manufactured using the steps, molds, and related structures depicted above, with no substantive differences.  Freeman Affidavit, paragraphs 10 and 11.  The molds for the SignRayz® G2 products are depicted in Exhibit 1 to

373250.1

the Freeman Affidavit, while those for the SignRayz® G1 and SignRayz® "Mini" products are depicted in Exhibits 2 and 3 to the affidavit. *Id.* and Exhibits 1, 2, and 3. The analysis set out above thus applies to each of the products in issue.

Accordingly, GE cannot establish that AgiLight's products are manufactured using a method that incorporates all of the elements and limitations of the '055 Patent. The steps and structures that enable the method claimed in the '055 Patent simply are not present in AgiLight's method of manufacturing its SignRayz® products. AgiLight therefore should be granted summary judgment of non-infringement on all claims asserted under the '055 Patent.

## IV.
## U.S. PATENT NO. 7,832,896

The '896 Patent addresses widening the beam width, or primary viewing angle, of light rays from an LED by positioning a lens over it. GE asserts that AgiLight's SignRayz® G2 products[10] infringe independent Claim 16, as well as dependent Claims 17 through 20.[11] Claim 16 claims the use of "a substantially dome-shaped refractive optical element covering the LED, the optical element having *a generally spherical outer profile and substantially ellipsoidal inner profile*." (emphasis supplied).

The parties have agreed that the phrase "generally spherical outer profile" means "an outer three-dimensional surface where the points on the surface are generally equidistant from a center point." The parties also have agreed that the phrase "substantially ellipsoidal inner profile" means "an inner three-dimensional surface where the sum of the distances from two focal points and the points on the inner surface is substantially constant." The two phrases thus are defined by standard geometric terms and by the relation of their profiles to center and focal points. These definitions are critical because, in the field of lens design, the inner and outer

---

[10]  The allegedly infringing products are the SignRayz® Apex G2, Core G2, Base G2, and Color G2 models.
[11]  Dependent Claims 17 through 20 are not infringed if Claim 16 is not. *See supra* n. 4.

surfaces of lenses are described in terms of the geometric shape formed by the points on the lens surface, and the geometric shape chosen significantly affects the refraction of the light rays passing through each point on the inner and outer surface of a lens.

AgiLight's lens has neither a generally spherical outer profile nor a substantially ellipsoidal inner profile. Instead, AgiLight developed a beam-widening lens that has an *aspherical* outer profile and a three-part inner profile that, to the extent it is curved, is *spherical*, not substantially ellipsoidal. The claims in the '896 Patent therefore do not read on AgiLight's lens.

### A. Prosecution History Estoppel Limits Claim 16.

During prosecution of the application for the '896 Patent, the limitation of the claimed lens to one with both a generally spherical outer profile and a substantially ellipsoidal inner profile was added to obtain the patent. Claim 16 of the inventors' patent application described the beam-widening lens only as "a substantially dome-shaped refractive optical element covering the LED . . . ."[12] The original claim did not describe the inner and outer profiles of the "dome-shaped refractive optical element" in geometric terms or otherwise.

The Patent Examiner determined that Claim 16, as submitted, was "unpatentable over Panagotacos et al. (US 6566824) in view of Mrakovich et al. (US 7160140)."[13] The Examiner noted that the Panagotacos patent showed a light engine with a "substantially dome-shaped refractive optical element covering the LED, the optical being configured to increase the primary viewing angle of the LED . . . ."[14] She therefore rejected Claim 16. "A rejection indicates that the patent examiner does not believe the original claim could be patented." *Festo Corp. v.*

---

[12] Patent Application, Claim 16, Appendix, Tab 6.
[13] Office Action, Tab 7 of Appendix, at p. 2.
[14] *Id.* at pp. 2-3.

373250.1

*Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) This demonstrates that the use of a dome-shaped lens to widen the beam of an LED was not invented by GE.

To overcome the rejection, the applicants amended Claim 16 to specifically define the geometry of the outer and inner profiles chosen to enable the desired widening of the beam of light rays emitted by the LED.[15] In doing so, they stated:

> Applicants have amended Claim 16 *to require* that the dome shaped refractive optical element have *a spherical outer profile and ellipsoidal inner profile.* Panagotacos displays various domes in Figures 10, 12 and 14. However neither of the domes depicted in Panagotacos is spherical in its outer profile and ellipsoidal in its inner profile. In fact, Figure 14 could, arguably, be interpreted as the inverse of the presently claimed invention.[16]

The applicants thus added the specific limitation that the lens have a spherical outer profile and an ellipsoidal inner profile to distinguish their claimed invention from the prior art.

The Patent Examiner focused on this amendment when she allowed the amended form of Claim 16:

> The prior art when taken separately or combined fails to teach and/or show a light engine as set forth in Claim 16 having . . . an LED on the first surface of the support, *a substantially dome-shaped refractive optical element covering the LED having a generally spherical outer profile and substantially ellipsoidal inner profile . . . .*[17]

The added claim language thus was critical to the reversal of the initial rejection of Claim 16.

A patentee's decision to submit an amended claim after a rejection "is taken as a concession that the invention as patented does not reach as far as the original claim." *Festo Corp.*, 535 U.S. at 734. The amendment of Claim 16 to add the narrowing limitation "having a generally spherical outer profile and substantially ellipsoidal inner profile" gives rise to "amendment based estoppel." *Conoco, Inc. v. Energy & Environmental Intern.*, 460 F.3d 1349,

---

[15] Amendment to Application, Tab 8 of Appendix, at p. 4.
[16] *Id.* at p. 6 (emphasis supplied).
[17] Notice of Allowance, Tab 9 of Appendix, at p. 2 (emphasis supplied).

11

1363-64 (Fed. Cir. 2006). "Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo Corp.*, 535 U.S. at 736.

Prosecution history estoppel "bars a patentee from reclaiming subject matter surrendered during prosecution to obtain the patent," and "applies both 'to claim amendments made to overcome prior art and to arguments submitted to obtain the patent.'" *Baxa Corp. v. McGaw Inc.*, 981 F. Supp. 1348, 1360-61 (D. Colo. 1997), *aff'd*, 185 F.3d 883 (Fed. Cir. 1999). Importantly, the "prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002).

The essence of prosecution history estoppel is that a patentee should not be able to use litigation to obtain coverage of subject matter relinquished during prosecution of its patent application. *Haynes Intern., Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577 (Fed. Cir. 1993), *clarified on reh'g*, 15 F.3d 1076 (Fed. Cir. 1994). "The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Id.* at 1578.

In light of the prosecution history of the '896 Patent, the inventors relinquished any right to exclude competitors from using lenses with configurations other than the one set out in the allowed claim. Claim 16 applies only to lenses with: (i) a generally spherical outer profile; and (ii) a substantially ellipsoidal inner profile. Both terms were added to the claim in order to overcome the examiner's rejection, and GE thus is estopped from arguing that Claim 16 reads on a lens that is not generally spherical on the outside and substantially ellipsoidal on the inside. If

12

a lens does not have that configuration, Claim 16 does not read on it, and competitors like AgiLight are free to use it to compete in the marketplace.

**B.     The AgiLight Lens Does Not Have A
        Generally Spherical Outer Profile.**

The lens used by AgiLight has an aspherical outer profile.  As shown by a photograph of a cross-section of AgiLight's lens, it appears as follows:



Outer Profile of Lens

*See* Affidavit of Glenn Freeman, paragraph 17.

The aspherical outer profile of AgiLight's lens is not "an outer three-dimensional surface where the points on the surface are generally equidistant from a center point."  The points on its surface are not generally equidistant from a center point, as shown by the photograph, which demonstrates that the lens does not have a spherical outer profile.  Indeed, if one simply carries forward in the mind's eye the line of its outer profile, it is clear that the line will never form a sphere, and thus the outer profile is not spherical.

This is confirmed by Professor Jose Sasian, a professor of the College of Optical Sciences of the University of Arizona,[18] and an expert in lens design engaged by AgiLight. Professor Sasian explains that:

> An inspection of a cross section of the lens used in the AgiLight G2 products reveals that the outer surface of the lens is not spherical or generally spherical.

---

[18] "The College of Optical Sciences, formerly known as the Optical Sciences Center, was established in Tucson, Arizona, in 1964 to fulfill a national need for more highly trained engineers and physicists in the optical sciences. Throughout its nearly 50-year history, OSC has stood on the forefront of the field; today, it educates more students in optics than any institution in the U.S." http://www.optics.arizona.edu/about-osc.

373250.1

> Furthermore, away from the center of the G2 lens, the shape of the outer surface
> becomes nearly flat in cross section and thus departs from an arcuate section.

Sasian Declaration, paragraph 6.[19]  This follows from the fact that the outer surface of AgiLight's lens is consistent with a Bezier curve.  *Id.*

As explained by Professor Sasian, "[a]n aspherical Bezier curve does not have a center point and cannot be described by a series of points which are equidistant from a center point.  *Id.* Due to this, "the distance of points on the outer surface of the Agilight G2 lens to a given point in the center of the lens is not constant but varies more and more from the given point in the center of the lens."  *Id.*  The points on that line thus are not generally equidistant from a center point:  "The majority of points on the AgiLight G2 lens outer aspherical surface do not fall on the the line of a sphere."  *Id.*, paragraph 7.  The outer profile thus cannot meet the definition of "generally spherical" that governs in this case.

Professor Sasian also explains that "a person of ordinary skill in the art, and an expert in optics, would not interpret that a generally spherical surface would refer to the outer aspherical surface of the G2 lens."  *Id.*, paragraph 7.  Such a person "would understand that the points on the outer surface of the G2 lens are not generally equidistant from a center point."  *Id.*,

The use of the word "generally" does not modify the term "generally spherical" to include shapes that are not spheres, let alone an outer surface that is aspherical.  In patent law, "words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter.'"  *Anchor Wall Sys. v. Rockwood Retaining Walls*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003).  As the court there held, "the phrase 'generally parallel' envisions some amount of deviation from exactly parallel."  *Id.* at 1311.  Similarly, the definition of "generally spherical" in

---

[19]   Dr. Sasian's declaration appears at Tab 10 of the Appendix.

373250.1

the case at bar allows for some deviation of the points on the surface from exact equidistance from a center point.  It does not, however, take in shapes that are not spherical.

A "generally spherical outer profile" requires that the outer surface of the lens be a sphere.  While the use of "generally spherical" may allow some deviation from the exact mathematical definition of a sphere, it does not encompass a lens that is aspherical.  AgiLight's lens lacks a spherical outer profile, so this element of Claim 16 is missing.

C.     **AgiLight's Lens Does Not Have A**
       **Substantially Ellipsoidal Inner Profile.**

The parties have agreed that "substantially ellipsoidal inner profile" means "an inner three-dimensional surface where the sum of the distances from two focal points and the points on the inner surface is substantially constant."  The inner profile of AgiLight's lens does not satisfy this definition.

The inner profile of AgiLight's lens has three different surfaces, as shown in the following drawing:



Professor Sasian offers a clear explanation of this inner profile:

373250.1

As shown in Exhibit 2 hereto, the inner surface of the G2 lens can be analyzed as having three portions, an upper spherical portion with radius of 1.5 mm, a middle cylindrical portion of radius 1.5 mm, and a lower conical portion (from cone and distinct from an ellipsoid) as shown in Fig. 4. The portions are joined at their boundaries and form a continuous inner surface of the G2 lens. I have observed that light from a Light Emitting Diode (LED) passes through all three portions of the inner surface.

It is through the use all three portions of the inner surface of the lens that the lens used in the AgiLight products widens the pattern of light rays emitted by the LED over which the lens is placed.

Sasian Declaration, paragraphs 8 and 9.

Professor Sasian further teaches that "[t]he inner surface of the AgiLight G2 lens is not substantially ellipsoidal in the sense understood by an expert in lens design." Sasian Declaration, paragraph 11. He also determined that "[t]he inner surface of the AgiLight G2 lens does not have two focal points." *Id.*, paragraph 10. As a result, "the inner surface of the lens used in the AgiLight G2 products cannot be described by the use of focal points or a constant distance to points on the inner surface of the lens from focal points." *Id.* As a further result, "it is not the case that the sum of the distances from two focal points and the points on the inner surface is substantially constant." *Id.*, paragraph 11.

The parties' agreed definition of "substantially ellipsoidal inner profile" is accompanied by the following text and drawing:

An exemplary graphical image showing two focal points (F1 and F2) where the sum of the distances D1+D2 from those points to a point S on the inner surface is substantially constant is provided below:

16



This text and drawing highlight the distinction between AgiLight's inner profile and one that would fit the definition.  The inner surface of AgiLight's lens does not have two focal points, and its spherical profile does not resemble the profile depicted in the drawing.

GE may seek to isolate the upper, spherical part of this inner lens profile in order to argue that the profile somehow is ellipsoidal.  Nothing supports the notion that the inner profile can be segmented in order to support GE's argument.   The agreed-to definition of a "substantially ellipsoidal inner profile" is "an inner three-dimensional surface where the sum of the distances from two focal points and the points on the inner surface is substantially constant."   This definition does not speak of "part of" the inner surface or the distance to "some of" the points on the inner surface; it speaks of "an inner three dimensional surface" and "the points on the inner surface."  The definition thus necessarily requires consideration of the entire inner surface, not just a cherry-picked part of it.

Moreover, "generally spherical" and "substantially ellipsoidal" cannot mean the same thing.  The inventors added these terms to distinguish their lens configuration from the prior art. GE is estopped from arguing that the claim reads on a lens that is not generally spherical on the

17

outside and substantially ellipsoidal on the inside.  It therefore cannot argue that the spherical portion of the inner profile somehow can be deemed substantially ellipsoidal.  That argument would equate "generally spherical" and "substantially ellipsoidal," and negate the addition of two distinct inner and outer profiles that was used to procure allowance of the claim.

In fact, AgiLight's lens is similar to a lens depicted in Figure 14 of the Panagatocos patent, which was the basis for the Patent Examiner's initial rejection of Claim 16:



FIG. 14

The Panagatacos patent describes this lens as having a "customized curved surface," which is analogous to AgiLight's aspherical outer profile, and, like AgiLight's lens, it appears spherical on the inside.  U.S. Patent No. 6,566,824, at Col. 13, ll. 8-15.[20]  This noteworthy because the inventors of the '896 Patent told the Patent Office that "Figure 14 could, arguably, be interpreted as the inverse of the presently claimed invention."[21]

If so, it seems the same should be true of AgiLight's lens.  In other words, AgiLight's lens is arguably the inverse of the lens profile claimed in the '896 Patent.  Because the inner profile of AgiLight's lens is not substantially ellipsoidal, GE can offer no evidence to meet this express element or limitation of in Claim 16.  Again, AgiLight should be granted summary judgment.

**V.**
**CONCLUSION**

---

[20]  *See* Appendix, Tab 11.
[21]  Amendment, Tab 8 of Appendix, at p. 6.

373250.1

GE cannot prove one or more elements or limitations of each of the asserted claims of the '055 and '896 Patents.  Because it cannot shoulder this burden, its claims fail and judgment should be entered for AgiLight.

Respectfully submitted,

Jonathan D. Pauerstein
State Bar No. 15637500
Rosenthal Pauerstein
Sandoloski Agather, LLP
755 E. Mulberry, Suite 200
San Antonio, Texas 78212
Telephone: (210) 225-5000
Facsimile: (210) 354-4034
jpauerstein@rpsalaw.com


Harry D. Cornett, Jr.
State Bar No. 0013179
Benjamin C. Sasse
State Bar No. 0072856
Tucker Ellis, LLP
925 Euclid Avenue
Cleveland, Ohio 44115-1414
Telephone: (216) 592-5000
Facsimile: (216) 592-5009
harry.cornett@tuckerellis.com
benjamin.sasse@tuckerellis.com

**ATTORNEYS FOR AGILIGHT, INC.**

373250.1

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2013, a copy of the foregoing DEFENDANT AGILIGHT, INC.'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORDANDUM was served upon the following counsel of record for Plaintiff in accordance with the Federal Rules of Civil Procedure:

> James D. Vail
> Ryan P. Nowlin
> Schneider, Smeltz,
> Ranney & LaFond, PLL
> 1111 Superior Avenue, Suite 1000
> Cleveland, OH 44114-2568
> Facsimile: (216) 696-7303

> Robert J. McAughan, Jr.
> David L. Terrell
> Sutton McAughan & Deaver, LLP
> 3 Riverway, Suite 900
> Houston, Texas 77056
> Facsimile: (713) 800-5699

Jonathan D. Pauerstein

373250.1